# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 95 C 5524 / 97 C 3430 | **DATE** | September 5, 2003 |
| **CASE TITLE** | *Levenstein v. Salafsky, et al.* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum and Order, judgment is hereby entered in favor of Defendants and against Dr. Levenstein. The Clerk is directed to enter a Rule 58 Judgment terminating this case.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 8 - 2003 date docketed | 311 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| RTS | courtroom deputy's initials | 03 SEP -8 AM 8:54 FILED FOR DOCKETING | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH H. LEVENSTEIN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 95 C 5524 |
| | ) | No. 97 C 3430 |
| BERNARD SALAFSKY, | ) | (Consolidated) |
| PATRICIA A. GILL, and | ) | |
| DAVID C. BROSKI, in their | ) | |
| official and personal capacities, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
SEP - 8 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph H. Levenstein was a tenured medical school professor and administrator at the University of Illinois at Chicago, Rockford campus, until his resignation in 1996. Levenstein filed suit against three university officials, Bernard Salafsky, Patricia A. Gill and David C. Broski, alleging that they effectively forced him to resign under a pretextual cloud of sexual harassment charges in violation of his constitutional rights to due process and equal protection. After denying Defendants' motion for summary judgment on the substantive constitutional claims, but granting their motion for summary judgment on their qualified immunity defenses, this Court held a bench trial.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following findings of fact and conclusions of law. The findings of fact are based upon careful consideration of the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent that the findings of fact may be construed to be conclusions of law, they shall be deemed conclusions of law. *See Miller v. Fenton*, 474 U.S. 104, 113-14

311

(1992). Likewise, to the extent the conclusions of law may be considered findings of fact, they shall be deemed findings of fact. *See id.*

## I.    Findings of Fact

### A.    *Levenstein and Salafsky*

1.    Joseph H. Levenstein is a family physician who was born and raised in South Africa. He practiced medicine in South Africa from 1969 until 1990. During that time, Levenstein earned an international reputation in the field of family and community medicine. Levenstein was widely-published, a frequent guest speaker at major professional functions, served on numerous professional committees, and enjoyed visiting professorships at fourteen universities around the world.

2.    In May 1990, Levenstein left his position as head of the University of Capetown's Unit of General Practice in the Department of Community Health to become a tenure track professor and Head of the Department of Family and Community Medicine at the University of Illinois' ("the University") College of Medicine at Rockford ("Rockford"). In November 1990, Levenstein was named Executive Head of the Family and Community Medicine Departments located at all four of the University's medical school campuses. In July 1992, the University awarded him tenure.

3.    Bernard Salafsky has been the Regional Dean at Rockford for approximately twenty years and was Levenstein's direct supervisor. During the first several years of Levenstein's employ at Rockford, Salafsky and Levenstein enjoyed an amicable professional relationship, marked by Salafsky's consistent professional support. In 1992, Salafsky gave Levenstein's application for tenure his "wholehearted support." In March 1994, Salafsky "wholeheartedly" recommended Levenstein, from among hundreds of potential applicants, to receive a Faculty of the Year award.

On June 22, 1994, Salafsky nominated Levenstein for the Pugh Charitable Trust "Primary Care Achievement Award." On that occasion, Salafsky described Levenstein as "the quintessential role model, educator, mentor, colleague and gadfly." In February 1995, Salafsky supported Levenstein's appointment as Chairman of the University's College of Medicine Primary Care Institute.

**B.**  *The University's Medical Service Plan*

4.      To manage the revenues and expenses generated through the clinical practices of the University's medical school physician faculty members, the University formed a Medical Service Plan ("MSP") pursuant to the University of Illinois Hospital Act, 110 ILCS § 330/0.01. The MSP was designed to provide an additional source of funding – separate from annual state appropriations – to cover the medical school's operating expenses such as faculty salaries, facilities maintenance, medical and office supplies, and malpractice insurance.

5.      Under the organizational umbrella of the University's MSP, Rockford had its own MSP ("MSP-R" or "Plan") by which Rockford's revenues and expenses were managed. The MSP-R's Management Committee bore ultimate responsibility for the general supervision and management of the MSP-R. Levenstein had substantial involvement in the fiscal management of the Plan. As a department head, Levenstein was responsible for the day-to-day operations and budget of his department which typically generated over half – approximately $4 million annually – of the Plan's gross billings. Additionally, Levenstein was a member of the MSP-R's Management Committee, which was comprised of Rockford's department heads and medical directors of the University's various clinics.

6.      Levenstein depended, in large part, on his department's MSP-R revenues to fund his

3

department's ongoing operations. MSP-R revenues accounted for approximately 70% of his department's annual budget, with state and grant funds comprising the rest.

7.      Salafsky, as Director of the MSP-R, oversaw administration of the Plan including billings, collections, expense payments and accounting practices. Salafsky was an *ex officio* member of both the MSP-R's Management and Executive Committee – he had voice but no vote.

8.      In August 1994, over Salafsky's objections, but with Levenstein's strong support, an Executive Committee was formed to focus on the MSP-R's financial issues.

9.      Beginning in April 1995, Levenstein began to inquire of several administrators, including Salafsky, about what he understood to be unexplained financial losses, resulting in a MSP-R deficit that had been reported by Salafsky. At the same time, Levenstein was undergoing his annual departmental budget negotiations with Salafsky's administration. In addition to his concern about the perceived financial irregularities, Levenstein openly questioned the propriety of a Salafsky-endorsed plan to construct a new specialty clinic for Rockford's Obstetrics/ Gynecology and Pediatrics departments (the "East Side Clinic"). Although Levenstein accepted the need for the clinic, he had strong reservations about the MSP-R's ability to afford such a project. Levenstein began to request financial information from Salafsky's Plan administrators, although it appears that these requests may have been on par with requests made in earlier years at or around the time of budget negotiations.

10.     Levenstein and Salafsky's relationship began to sour. There was open conflict at meetings, during which Salafsky "would get real angry."

11.     Sometime in April, 1995, Dr. Frank Chmelik, Chairman of the MSP-R, perceived the friction between Levenstein and Salafsky to be so disruptive that he approached Salafsky in an

4

attempt to iron out their differences. During this April 1995 meeting, Salafsky told Chmelik that "there was a much larger problem than this that would become more obvious over the ensuing weeks."

### C.   *Levenstein's Suspension*

12.    On April 17, 1995, Patricia Gill, Deputy Associate Chancellor of Affirmative Action Programs ("AAP"), received an "anonymous" letter from a medical student named Brenda Fann, describing alleged conduct by Levenstein that Fann believed was sexual harassment. The letter included allegations of invading Fann's personal space, staring at her, trying to hold her hand, attempting to hug her, and making inappropriate comments about "how lucky her boyfriend was." Fann sent her letter to Gill following several conversations with Marjorie Stearns, Assistant Director of Student Affairs at Rockford, in which Stearns encouraged Fann to contact Gill. Although unsigned, the letter was not truly "anonymous" in that Stearns had spoken to Gill about Fann's complaint prior to Gill's receipt of the letter.

13.    On April 27, 1995, Gill sent a copy of Fann's letter to Levenstein, Salafsky and Executive Dean Gerald Moss, Dean of the entire College of Medicine, advising that pursuant to University policy, no investigation would ensue because the letter was "anonymous." Gill also advised Levenstein that in the event the "anonymous" complainant or another individual came forward with similar allegations, the allegations would be investigated. Levenstein sent a response to Gill indicating that he had no knowledge or recollection of the behavior alleged by the "anonymous" student and was deeply upset by the allegations.

14.    In the meantime, throughout the Spring of 1995, Levenstein was undergoing a routine five-year review of his performance as department head. Dr. Uttech, a physician at Rockford

5

who had worked with Levenstein, received an evaluation form for Levenstein's five-year review. Uttech completed the form but felt it was incomplete because it did not include questions relating to appropriate workplace conduct. Uttech approached Dr. Lowell Edwards, her supervisor and a member of Levenstein's five-year review committee, to discuss concerns she had about Levenstein's behavior. Uttech told Lowell that Levenstein had inappropriately touched her and made similarly inappropriate comments directed toward her. Sometime in late April, Salafsky learned that Uttech had reported inappropriate conduct by Levenstein. Uttech was referred to Gill. On May 1, 1995, Uttech telephoned Gill to discuss her concerns but did not identify herself, except to say that she was a faculty member, because she was fearful of future career ramifications. Ultimately, Uttech did identify herself to Gill shortly after returning from maternity leave in September 1995. At that time, Uttech complained that Levenstein had touched her hips and waist while she read patients' schedules, and had grabbed her hand and placed it over her breast area with his fingers on top of hers. Uttech stated that Levenstein had made her extremely uncomfortable and that she adjusted her daily routine to avoid being alone with him.

15.    On a different front, on May 4, 1995, Salafsky presented the proposal for the East Side Clinic to Moss, Charles Rice, Moss' assistant dean, and Dieter Hausmann, the Vice Chancellor for Health Services. All present agreed that the East Side Clinic project should proceed.

16.    Levenstein made several inquiries in an attempt to determine the identity of the "anonymous" letter-writer. Levenstein testified that if he had discovered her identity, he planned to contact her and tell her that she could have spoken to him directly.

17.    On May 8, 1995, Moss and Salafsky conferred about Levenstein and agreed that they

6

would give him two options: either resign or be suspended with pay and investigated for "sexual harassment."

18.     Later that same day, Chmelik approached Salafsky for the second time in an attempt to improve communications between Levenstein and Salafsky. During this meeting, Salafsky told Chmelick that there was a "sexual harassment charge" against Levenstein, and that six to eight women were involved.

19.     Also on May 8, Linda Kennedy and Tracy Moen Hobart, two of Levenstein's department's support staff overheard Levenstein discussing an anonymous letter he had received containing allegations of sexual harassment. That same day, Kennedy and Hobart met with Rockford personnel officer Maurine Semevolos and complained that they too had been sexually harassed by Levenstein. Their allegations consisted of invading personal space, "blowing kisses," inappropriate touching (running fingers down Kennedy's leg and neck) and verbal sexual innuendos. Semevolos advised Kennedy and Hobart to contact Gill if they wished to pursue formal sexual harassment complaints. At some time on that same day, Salafsky became aware of Kennedy's and Hobart's complaints. It is not clear whether Salafsky was aware of these complaints prior to his meeting with Chmelik.

20.     On May 11, 1995, Levenstein was summoned to a meeting with Salafsky and Dr. Wortmann, Associate Regional Dean. At this meeting, Salafsky advised Levenstein that additional complaints of sexual harassment had been made against him, and that if he did not resign, effective at 5:00 p.m. that day, he would be suspended with pay pending the outcome of an investigation of the sexual harassment complaints. At this time, no formal sexual harassment complaint had been filed, although Salafsky had knowledge that Kennedy and Hobart, who had

been referred to Gill on May 8, 1995, had both indicated a desire to pursue formal complaints against Levenstein. Salafsky also had knowledge of the recent complaints by Uttech and the prior complaints by Ms. Cotsones, Ms. Anderson and Ms. Kelsey (*see* Sec. I.D., *infra*).

21.     On that same day, following his meeting with Salafsky and Wortmann, Levenstein telephoned Gill to inquire about the complaints made against him. Gill informed him that, in the event formal complaints were filed, she would conduct an investigation. She added that if he resigned, no investigation would be pursued.

22.     After his meeting with Salafsky and Wortmann, and his telephone call with Gill, Levenstein sought the advice of several other faculty members regarding his situation. Levenstein decided not to resign.

23.     Salafsky suspended Levenstein effective at 5:00 p.m. on May 11, 1995, pending the outcome of an investigation of the sexual harassment allegations.

24.     The following day, May 12, 1995, Salafsky called a meeting of the faculty in Levenstein's department during which he announced that Levenstein had been suspended pending investigation of sexual harassment complaints. At the meeting, one faculty member, Jan DeBruyne, interrupted the meeting to confirm with Salafsky that she had accurately recorded his statements to the faculty. Salafsky agreed that she had. DeBruyne's contemporaneous notes were as follows:

> Basically Dr. Salafsky explained to those convened that Dr. Levenstein had been suspended with pay due to alleged sexual harassment. He stated that the case had gone directly to Pat Gill in Chicago, who handles the affirmative affairs and sexual harassment issues for the University of Illinois. Dr. Salafsky stated that a number of women at different 'stations' or levels of employment at UICOM.R [Rockford] had written letters which

> allege that Dr. Levenstein had committed acts of verbal and/or
> physical abuse. He indicated that four of such letters were
> sent to Pat Gill during the past month, which prompted her
> to action according to university policy. Dr. Salafsky stated
> that out of those four letters one is known to be anonymous. He
> further stated that of the final three letters it is not known whether
> there are accompanying signatures.

(alteration added).

25.    As of May 12, 1995, Gill had received one letter complaining of sexual harassment – the

one from Brenda Fann.

### D.    *History of Informal Sexual Harassment Complaints Against Levenstein*

26.    Although Gill only had one written complaint against Salafsky, and was aware of three

other potential complainants – Kennedy, Hobart and Uttech – this was not the first time

Levenstein had been the subject of sexual harassment allegations.

27.    In late 1990 or early 1991, two administrative staff employees, Rena McLaughlin

Cotsones and Kathy Kaufman Anderson, complained of sexually inappropriate behavior by

Levenstein to Donna Greene Wagenknecht, then Personnel Director at Rockford. Cotsones

testified at trial that Levenstein had made inappropriate flirtatious and sexual comments, and had,

on one occasion, run his fingers through her hair. Wagenknecht testified that Anderson had

complained to her that Levenstein had stared and "blown kisses" at her during meetings,

inappropriately brushed against her shoulders, and "played footsie." At trial, Levenstein

admitted that he winked at Anderson and that he touched her foot under a table, and further, that

Anderson had confronted him and "gave him hell." He denied all the other allegations.

28.    In or about February 1991, Wagenknecht informed Salafsky of the details of Cotsones'

and Anderson's complaints. Salafsky and Levenstein spoke about the incidents and Salafsky

informally warned Levenstein that he needed to be aware of his actions and comments as they may be perceived by someone else.

29.    In or about September 1993, Andrea Kelsey, a clerk/typist in Levenstein's department, complained in confidence to Vivian Eggleston, then office manager in Levenstein's department, that Levenstein had made her uncomfortable by his touching, gestures and remarks. On one occasion, she alleged that Levenstein cornered her in a copy room and pressed his body against hers. Kelsey told him to stop. Eggleston reported the conversation to Wagenknecht, who, in turn, notified Salafsky. Levenstein testified that he was never apprised of Kelsey's complaint. Salafsky could not recall whether he had discussed Kelsey's complaint with Levenstein. Salafsky testified, however, that he responded by inviting Gill to give a talk to all department heads and chairs about sexual harassment at one of their regularly scheduled meetings. Levenstein attended the meeting.

30.    Despite these incidents, Levenstein's file contained no documentation or warnings regarding sexual harassment or any other inappropriate conduct.

### E.    *Post-Suspension Investigation*

31.    On May 16, 1995, Salafsky sent an e-mail to Moss which stated:

> Liz Burns also called . . . having called you. Said she was "shocked" as she had just seen everyone at the STFM meeting in New Orleans. Anyhow, she kindly volunteered to help and knows some people that are looking. I think it is a rather attractive position here, and with some luck won't be vacant as long as pediatrics.

The "attractive position" Salafsky was referring to was Levenstein's position as professor and department head.

32. Immediately following Levenstein's suspension, Salafsky had appointed Dr. Lowell

Edwards to act as interim head of Levenstein's department. Over the next two months, under

Edwards' watch, Salafsky would substantially reorganize Levenstein's department.

33. On May 17, 1995, Salafsky spoke with Fann himself, and reported to Moss as follows:

> Gerry: I hope you now do talk with the Rockford medical
> student who has to date not wished to reveal her identity. I
> believe she will come forward and sign a formal complaint.
> Her reluctance stems from her hope of eventually joining the
> faculty here and the fear that others who defend Dr. Levenstein
> may be "unforgiving." I've assured her that won't be an issue
> . . . As of now, I believe two clerical people and at least one
> medical student will sign formal complaints next week. There
> may be more. I'll keep you posted.

34. On May 17, Fann wrote and signed a formal letter of complaint against Dr. Levenstein.

35. Gill then received formal letters of complaint from Kennedy and Moen, as well as a

single, joint "Request for Action" form signed by Fann, Kennedy and Moen. The form was dated

May 21, 1995.

36. Upon receipt of the letters, Gill began her investigation of the charges brought by Fann,

Kennedy and Moen. Gill edited the complaints to include only those allegations which she felt

that, if proved, would constitute a violation of University policy. The complaints included

allegations of invading personal space; touching their hands as if trying to hold them; repeatedly

brushing his hand against Kennedy's rear end; running his finger up and down Kennedy's leg at a

meeting; running his finger up and down Kennedy's neck, and when she turned around, saying "I

was going to kiss your neck if you hadn't turned around'; blowing kisses; and various sexual

comments.

37. In a letter to Levenstein dated May 24, 1995, Gill notified him of the specifics of the

11

complaints lodged by Fann, Kennedy and Moen. The letter informed Levenstein that the alleged facts, if true, could violate the University's policy prohibiting sexual harassment, therefore AAP must proceed to investigate the claims. The letter stated that the first step of the process allowed Levenstein to respond in writing to the allegations. The letter requested a response within ten days from the date he received the letter. Further, the facts gathered would be submitted to a panel for review. Then, findings or determinations would be made within thirty days of the completion of the investigation and be provided in writing to both parties. At that time, any recommendation, if necessary, would be made to Levenstein's superiors. Gill assured Levenstein that he would be given full opportunity to respond to any allegations raised during the investigation.

38.    On June 12, 1995, Levenstein's attorney submitted, on Levenstein's behalf, a letter to Gill in response to the sexual harassment complaints. The letter generally denied any sexually offensive conduct, responded to each allegation specifically, and offered a willingness to speak with and apologize to anyone who has perceived his conduct as inappropriate.

39.    Through the course of her investigation, Gill interviewed twenty-one persons from May through July, 1995, including Levenstein.

40.    On July 7, 1995, Gill interviewed Levenstein, who was accompanied by counsel. Levenstein represented that his June 12, 1995 written response adequately addressed the specific allegations. Levenstein added that there were political reasons that he was being targeted and that he was not given adequate warning by Salafsky about any specific incident prior to his suspension.

41.    On July 23, 1995 Gill completed her investigation and report. Her fourteen-page single-

12

spaced report concluded that Levenstein had violated the University's sexual harassment policy.

42.     Following consultation with Moss regarding suggestions for corrective action, Gill added the option of "termination" to Gill's list of potential corrective measures. Gill submitted the report to her supervisor, Myrna C. Adams, the Associate Chancellor and Director of AAP.

43.     Gill then reviewed the results of her investigation and conclusions with Adams. Adams concurred that Levenstein had violated the University's sexual harassment policy. In fashioning corrective measures, Adams testified that she considered (i) the number of women who were affected by Levenstein's behavior, (ii) the behavior itself which was more than just verbal, (iii) the impact that a person holding a position as a full professor and department head had on the institution, and (iv) the fact that there had been institutional education to clarify the University's sexual harassment policy.

44.     On July 28, 1995, Adams submitted to Levenstein the results of the AAP's investigation and recommendations which would be submitted to Deans Moss and Salafsky for remedial action. The letter stated that Adams concurred with the investigator (Gill) that Levenstein was in violation of the University's sexual harassment policy. A copy of Gill's report was enclosed. Adams' recommendations were: (a) to not permit Levenstein to exercise authority over female subordinates, whether students or employees, for a period of up to three years; because the investigation did not reveal any evidence of misconduct in the classroom or while treating patients, her recommendation of restricted assignment of duties did not extend to "classroom instruction, lecturing or patient treatment," *or* (b) if the administrators were unable to create an arrangement whereby Levenstein could "fully perform" as a member of the faculty consistent with recommendation (a), then termination was appropriate. Adams' letter made no

13

recommendation, one way or the other, regarding Levenstein's on-going suspension. Finally, the letter stated that Levenstein and/or the complainants could appeal the AAP's findings and recommendations to Chancellor Broski within ten days of receipt of the letter. Copies of the letter were sent to Salafsky, Moss, Broski, Fann, Kennedy, Moen and Bruce Kite, a University lawyer.

45.    Adams testified that during the ten-day appeal period, she expected the administrators to come to a preliminary consensus regarding what corrective action to take with respect to Levenstein. If Levenstein appealed, Adams expected that the administrators would defer their decision pending outcome of the appeal process.

**F.    *Levenstein's Appeal***

46.    On August 9, 1995, Levenstein submitted an appeal of the AAP's investigative findings and recommendations to Broski.

47.    Broski sought Gill's recommendations on potential panel members, and assembled a three-person Faculty Appeal Panel ("FAP").

48.    The FAP conducted its own investigation, which included a review of the AAP findings, as well as interviews of Fann, Hobart, Kennedy, Levenstein, and several witnesses including those suggested by Levenstein.

49.    On August 28, 1995, Salafsky sent an e-mail to Moss stating:

> Jerry: Spoke to Dieter on two issues. 1. Apparently we may have problems getting rid of Levenstein because the faculty senate will ask why we did not counsel him to gain formal help for his 'pathology'!

"Dieter" is Dieter Hausmann.

50. On September 22, 1995, and later on October 18, 1995, the FAP requested, and Broski approved, two requests for thirty-day extensions for the FAP to complete their investigation and submit their findings.

51. On October 5, 1995, the MSP Management Committee unanimously approved the East Side Clinic. Later that month, Hausmann made a presentation to the Board of Trustees regarding the clinic.

52. On November 7, 1995, Levenstein and his counsel were given the opportunity to make a final statement and to comment on the various witness statements.

53. On November 20, the FAP issued a seventeen-page single-spaced report which concluded that there was a "sufficient factual basis" to support the conclusion that Levenstein had submitted Fann, Kennedy and Moen to "unwanted sexual gesture, physical contact, and statements that were offensive, humiliating or interfered with required tasks or career opportunities at the University." In arriving at its conclusion, the FAP consistently found Levenstein's version of events to be less credible than the complainants. The FAP also expressly rejected Levenstein's allegations that Gill was biased and predisposed to finding him in violation of the University's sexual harassment policy.

54. The FAP declined to offer any recommendations regarding corrective actions or sanctions, but suggested reconsideration of Adams' recommendations which it characterized as "contradictory" and "not capable of being carried out." In conclusion, the FAP noted the following:

> [B]efore any decision is made regarding corrective action, serious
> consideration must be given to the mitigating circumstances as well
> as the aggravating ones. The aggravating factors include the fact

that Dr. Levenstein had been previously warned about this behavior,
he consistently denies any wrong doing and that there appears to be
a pattern of similar conduct involving other personnel over a period
of years, but not specifically addressed in these charges. However,
there are mitigating factors that the panel feels the administration
should consider as well. These factors include witnesses who never
saw inappropriate behavior by Dr. Levenstein, the many letters of
support received and expressions of confidence in Dr. Levenstein
from colleagues, staff and students, and Dr. Levenstein's strong
record of achievement and contributions he has made as a faculty
member at the College of Medicine in Rockford.

55.     On December 12, 1995, Salafsky recommended to Moss in writing that procedures be

commenced to remove Levenstein from his tenured faculty position pursuant to the University

Statutes. In his letter, Salafsky stated that the complaints, the findings of the AAP and the

affirmation of those findings by the FAP constituted cause for termination. Salafsky addressed

Adams' first alternative recommendation, but rejected it because he thought it impossible to

place Levenstein in a teaching, research or clinical position in which he would not have some

type of supervisory role over female students, staff or faculty or be in a position of authority

which he could abuse.

56.     On that same day, Salafsky recommended to Moss, again in writing, that Levenstein be

removed as a department head. Salafsky's decision to remove Levenstein was based on both the

results of the five-year review of Levenstein's performance and the sexual harassment findings of

the AAP and the FAP. Although Levenstein's tenured faculty position could be terminated only

in accordance with University statutes, department heads could be removed upon

recommendation of the Dean with the Chancellor's approval.

57.     Moss concurred with Salafsky's recommendations and, on December 13, 1995,

recommended in writing to Broski both that the University proceed with the removal of

16

Levenstein from the tenured faculty of the University, and that he be removed as department head. Moss based his recommendations on roughly the same factors cited by Salafsky.

58.     On or about December 14, 1995, Broski received and reviewed the recommendations of Salafsky and Moss regarding Levenstein. Broski reviewed the AAP report and recommendations and the FAP report. Broski also received and reviewed letters of support for Levenstein submitted after his receipt of the FAP report and the recommendations of Salafsky and Moss.

59.     On December 21, Broski recommended in writing to President Stukel that Levenstein's tenure be reviewed "with the intent to revoke" in accordance with University statutes. Broski testified credibly that prior to making this recommendation, he discussed with Stukel the seriousness of a recommendation of tenure termination. The basis for Broski's recommendation mirrored that of Salafsky and Moss, as well as his observations that Levenstein had maintained throughout the process that he had done nothing wrong, and that termination was the appropriate measure to protect the welfare of the students, faculty and staff at Rockford.

60.     Also on December 21, Broski advised Stukel that Levenstein had been placed on paid leave pending conclusion of the investigation and determination of appropriate action. Broski advised Stukel that if he, as President, believed that cause for dismissal *may* exist and that alleged violations of the University's sexual harassment policy constitute exceptional circumstances, then Stukel must determine his leave status under Article X, Section 1 of the University Statutes. Broski forwarded both the AAP and FAP files to Stukel.

61.     That same day, Broski informed Levenstein in writing that he was relieved as department head and that he had recommended to Stukel the commencement of dismissal proceedings under the University Statutes.

17

### G.  *Applicable Provisions of the University Statutes*

62.  The University Statutes, Article X, Section 1, ¶¶ d & e(1)-(9), delineate the proceedings

for dismissal of an appointee to the academic staff with indefinite tenure.  Paragraph d states that

due cause for dismissal exists only if:

> . . . a faculty member's performance of University duties
> and functions or extramural conduct is found to demonstrate
> clearly and convincingly that the faculty member can no
> longer be relied upon to perform those University duties
> and functions in a manner consonant with professional
> standards of competence and responsibility

Paragraph e(1) sets forth the procedures the President must follow prior to commencing tenure

termination proceedings:

> (1) *Charges.* When it shall appear to the president that cause
> of the dismissal of an appointee may exist, the president shall
> consult with the Faculty Advisory Committee [("FAC")].
> The president, after such consultation, shall determine whether
> dismissal proceedings should be instituted.  Charges looking
> to dismissal shall be preferred by statement in writing by the
> president or the president's designee and shall be filed with
> the clerk or secretary within thirty days after consultation with
> the [FAC].  The statement shall be sufficiently specific to
> reasonably inform the appointee of the nature of the charges
> and enable the appointee to present a defense to them.

(alterations added.)  Paragraph e also provides that tenure termination procedures shall include a

notice of the charges, an evidentiary hearing before the Committee on Academic Freedom and

Tenure and rights of appeal to the Board of Trustees in the event the president decides to pursue

termination.

Paragraph e(8) govern's the president's reassignment of an appointee pending

consideration of dismissal:

(8) *Reassignment of Duties.* Under exceptional circumstances, and when such action is clearly necessary and justified, the president may direct that a faculty member be relieved of some or all of the faculty member's University duties and functions and reassigned to others, without prejudice and without loss of compensation, pending the final decision of the case, subject to the following provisions: (a) the president may reassign duties before the filing of any charges only after giving notice to the chair or, in the absence of the chair from the University to some member of the [FAC], that the president believes that cause for dismissal may exist; (b) if the president reassigns those duties after so giving notice to the chair or some member of the [FAC], such reassignment shall terminate within thirty days after that committee has made its recommendations to the president unless the president initiates dismissal proceedings by the filing of charges for dismissal within that thirty-day period; and (c) if the president initiates dismissal proceedings by filing charges for dismissal, the president may reassign duties or extend a previous reassignment of duties until the termination of those proceedings or until the effective day of dismissal if the proceedings should result in dismissal.

(alterations added.)

63.    It is undisputed that Levenstein was aware of these provisions of the University Statutes.

**H.    *Stukel's Review***

64.    On January 2, 1996, Levenstein, still under suspension, wrote Stukel regarding Broski's

recommendation that Stukel commence a tenure revocation hearing. Levenstein stated in the

letter that he was wrongfully accused of sexual harassment, that he was subjected to a sham

investigation and appeals process, that virtually all of the incriminating evidence against him had

been fabricated by either Gill or Salafsky, that Salafsky in particular was motivated by a political

agenda against him, and that he was prepared to demonstrate all of this in the event that Stukel

opted for a dismissal hearing. Levenstein also stated: "As you may or may not have been

advised, I have proposed reasonable terms under which I would be willing to voluntarily leave the University. On two occasions, this offer was summarily rejected by the University's counsel." Finally, Levenstein requested that Stukel lift the suspension to allow him to return to work until the matter was resolved.

65.     In January 1996, Stukel reviewed the materials Broski and Levenstein had provided him and concluded that the charges against Levenstein may warrant dismissal, and that he should proceed with dismissal proceedings. Stukel also determined that Levenstein should remain suspended to maintain a harassment-free environment at Rockford.

66.     On January 9, Stukel responded to Levenstein's letter. Stukel advised Levenstein that he had received a recommendation from Broski that dismissal proceedings be commenced against Levenstein, that the process was governed by the University Statutes, and that when he completed his review of the relevant materials he would seek the advice of the FAC. Stukel stated that he would include Levenstein's January 2 correspondence in with the materials he would send to the FAC. Stukel acknowledged that Levenstein had been placed on a leave of absence since May 11, 1995. Stukel indicated that following his consultation with FAC, he would decide whether there was just cause to proceed with the dismissal proceedings. At that time, he also would determine whether his suspension should continue. Stukel urged patience, assured Levenstein that he viewed the matter "most seriously," and advised that "in the meantime, the status quo will continue."

67.     On February 7, 1996, Stukel wrote to the Co-Chairs of the FAC indicating that he sought their recommendation regarding whether tenure termination proceedings should be commenced against Levenstein. Stukel forwarded to the FAC draft charges that had been prepared, at

20

Stukel's request, by Broski with the assistance of University counsel. Stukel requested the FAC, as soon as possible following their review, provide him with written advice on two questions: "(1) If the allegations are true, do they constitute an appropriate basis for termination of Dr. Levenstein? . . . (2) If termination proceedings are commenced, should he exercise his authority under Article X, Section 1.e.(8) of the Statutes and relieve Dr. Levenstein of his faculty duties and responsibilities and reassign him to other duties pending the completion of the hearing?"

68.    Also on February 7, Stukel advised Levenstein and the FAC that he was exercising his authority under Article X, Sec. 1, ¶ e(8) of the University Statutes to reassign Dr. Levenstein to other duties without prejudice and without loss of compensation. Stukel delegated the reassignment to Broski, who, in turn, delegated the responsibility to Rice. Rice assigned Levenstein the task of reviewing and evaluating medical videotapes that needed content and accuracy assessment. Both the videotapes and audio visual equipment would be delivered to Levenstein's home. Levenstein's protests of his reassignment and requests to see patients at the Office of Family Practice were summarily denied by Rice. Rice credibly testified that he considered the task appropriate and necessary. Levenstein also testified convincingly that he found the task to be demeaning. On March 28, approximately one month after he received the first batch of tapes, Levenstein submitted to Rice his review of the tapes.

I.    *FAC Review*

69.    Meanwhile, Levenstein brought four charges of academic misconduct against Salafsky and various other administrators at Rockford. The FAC agreed to review Levenstein's complaints. The FAC advised Stukel that before they would advise him on whether he should commence dismissal proceedings, they would first assess the legitimacy of Levenstein's

21

academic misconduct charges.

70.     On March 8, 1996, the FAC requested from Stukel more time to deliberate.  Stukel
granted the request.  Levenstein was not informed of the request.

71.     On April 15, 1996, the FAC advised Levenstein in writing that they had concluded that
his academic misconduct charges were meritless.  The FAC did not copy Stukel on their findings.

72.     On April 16, the FAC advised Stukel that he should not pursue termination of
Levenstein's tenure and recommended a reassignment consistent with Adams' first alternative
recommendation, coupled with efforts at rehabilitation.  The FAC, in its report, stated that it
perceived "no room for serious contention" that "several" of the charges against Levenstein
appeared valid.  Nevertheless, the FAC stated that "in good conscience, we cannot, even for
purposes of giving you advice, simply assume all the charges to be true. . ."  The FAC articulated
its strong reservations regarding whether the allegations proved that his "future performance . . .
will be professionally substandard," or, put another way, whether the evidence of Levenstein's
past conduct "clearly and convincingly" predicted that he would be unable to perform his duties.
Thus, the FAC "advise[d] that the standard would not be met on this record . . ."  The FAC was
impressed "that those closest to this investigation," referring to the AAP and Adams, in
particular, "believe that the nature of the claims of misconduct against Levenstein may be
appropriately addressed through a plan of remediation."  The following excerpt summarizes the
FAC's position:

> Based upon our reading of the record, as you have sent it
> to us, it appears to us that, in at least some cases, the
> evidence already garnered is not particularly persuasive,
> nor the conduct, if proved *necessarily* wrongful.  For
> instance, in at least one case a complaining witness under

22

Dr. Levenstein's supervision is alleged to have had
significant out-of-the-office voluntary contact with
Dr. Levenstein at the very same time of the incidents
complained of. We also believe that, in some cases,
Dr. Levenstein's actions may be subject to an innocent
interpretation, or at worst, may be unintentional. This
has not been sufficiently explored

       \*      \*      \*

It is also true that both Dean Salafsky and the faculty
panel, in what we conclude to be rather summary
fashion, have indicated that Dr. Adams' recommendations
could not be implemented. We cannot credit Dr. Salafsky's
contrary statement with great weight in advising you and
certainly cannot conclude that his statement would meet
the clear and convincing test if subjected to careful scrutiny.
The record which we have reviewed indicates that there are
managerial disputes between Dr. Salafsky and Dr. Levenstein
which may well give rise to bias on his part, leading in turn
to an inference that his conclusions on remediation could be
less than objective. This is reflected in what appears to us to
be the overly aggressive approach he may have taken in the
crucial time frame in early May, 1995, particularly in some
of the statements which he has admitted he made to the
faculty.

The FAC did not copy Levenstein or any administrators on their recommendations to Stukel.

73.     FAC Co-Chair Truman Anderson testified that he had reservations about the

FAC's proposal, but nonetheless acceded to the majority. He also credibly testified that the FAC,

an elected faculty body, had an institutional aversion to tenure termination.

74.     The FAC's recommendation was advisory and did not bind Stukel. Pursuant to

University Statutes, Article X, Section 1, ¶ e(1), Stukel was required to either commence

termination proceedings against Levenstein or return Levenstein to active employment as a

tenured faculty member within 30 days of his receipt of the FAC's advice.

## J. *Levenstein Resigns*

75.  Before Stukel had made a decision, Levenstein, on April 23, 1996, tendered a resignation letter to Stukel.  Because Stukel was out of the office traveling, Stukel's office forwarded Levenstein's resignation to the College of Medicine.  Rice acknowledged and accepted Levenstein's resignation in writing.  In his letter, Levenstein states that "I have persevered for 11½ months under the incredible burden of unsupported allegations and public humiliation in the hope that someone would listen to the truth.  To be frank, you were my last hope . . . Four and a half months later, you appear to be no closer to bringing this matter to a close . . ."

76.  Stukel did not inform Levenstein that the FAC had submitted their report, nor did the University Statutes require him to do so.  At the same time, Levenstein did not inquire as to the status of the FAC's review.

77.  Had Levenstein not resigned, and had Stukel chosen to pursue tenure termination proceedings, the University Statutes, Article X, Sec. 1, ¶ e(1)-(8), would have required: (i) a statement of the charges, (ii) an opportunity to file an answer to the charges, (iii) a closed hearing, on at least twenty days notice, before the University's Committee on Academic Freedom and Tenure, at which the appointee would be entitled to be present at all sessions when evidence was being received, to be accompanied by an attorney, to question witnesses and, when all the evidence has been received, to make a closing argument in person or by counsel, (iv) the Committee's explicit findings of fact on each charge, conclusions and recommendations, (v) a reasonable opportunity to file a written statement detailing objections to the Committee's findings, conclusions and recommendations, (vi) a hearing before the University's Board of Trustees, unless the Committee recommended that the charges be dropped and the President

concurred, and (vii) further review and hearings before the Board of Trustees, with the same or similar rights and opportunities as presented at the Committee on Academic Freedom and Tenure level, with the Board making the final decision.

78. As with the other provisions of the University Statutes relating to termination of a tenured faculty member, Levenstein was aware of these provisions.

79. Since resigning from the University, Levenstein has been consistently employed in and around the Rockford community practicing medicine.

## II. Conclusions of Law

Levenstein's Amended Complaint alleges two Counts, both brought pursuant to 42 U.S.C. § 1983. First, Levenstein avers, under a constructive discharge theory, that he was deprived of his property interest in tenured employment without Fourteenth Amendment due process. Second, Levenstein alleges that he was denied Fourteenth Amendment equal protection because University administrators, motivated by subjective ill-will, treated him differently than another similarly situated tenured professor who also was accused of sexual harassment. The Court addresses Levenstein's claims in turn.

### A. Procedural Due Process

"Procedural due process claims require a two-step analysis. The first step requires us to determine whether the plaintiff has been deprived of a property interest; the second requires a determination of what process is due." *Townsend v. Vallas*, 256 F.3d 661, 673 (7th Cir. 2001). For ease of analysis, the Court separates the inquiry into three steps: (i) whether Levenstein had a Constitionally-cognizable property interest in his position, (ii) whether Defendants deprived Levenstein of that property interest, and (iii) whether that deprivation was without notice and an

25

opportunity to be heard. Resolution of the first question is clear – as a tenured faculty member,

Levenstein had a property interest in his position. *Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th

Cir. 1998) Predictably, much of this litigation has focused on the third question, whether

Levenstein received adequate "due process" throughout the investigation of the sexual

harassment charges against him. Levenstein argues that the investigation was a sham from the

start and hooks his wagon to the caselaw establishing that "when the procedures used to

investigate the charges are a sham through and through, there has not been a constitutionally

sufficient opportunity to respond." *Levenstein*, 164 F.3d at 351 (citations omitted). Defendants

respond that Levenstein waived his entitlement to due process by resigning and, alternatively, he

did receive sufficient due process prior to his resignation. This inquiry, however, presupposes an

affirmative answer to our second question – was Levenstein *deprived* of a property interest. This

antecedent question is the start, and ultimately the end, of our treatment of Levenstein's due

process claim.

      The University did not terminate Levenstein. Moreover, Levenstein does not argue that

his suspension alone deprived him of a property right. "Levenstein is not arguing that the initial

act of suspending him with pay violated any constitutional right, and he is wise not to do so."

164 F.3d at 351 (citations omitted); *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541,

544-45 (1985) ("[I]n those situations where the employer perceives a significant hazard in

keeping the employee on the job, it can avoid the problem by suspending with pay.")

      Rather, Levenstein contends that he was constructively discharged. An employee is

constructively discharged when "his working conditions were made so miserable that he was

forced to quit." *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984) (citations

omitted).  The Court does not evaluate Levenstein's employment status through his eyes, but rather through those of a reasonable person.  *Townsend*, 256 F.3d at 677.

Levenstein argues that the 11½-month suspension, the physical barring from campus, the humiliation resulting from both Salafsky's exaggerated report to his department's faculty on May 12, 1995 and his removal as department head, and finally, his reassignment to review medical videotapes, which he characterized in his resignation letter to Stukel as "an assignment which [he did] not consider appropriate for even a third year medical student," constituted a constructive discharge.  The Court disagrees.

First, the investigation was anything but unfounded.  Although the Court has strong reservations about Salafsky's overzealous pursuit of Levenstein's suspension, Salafsky's conduct, at most, started an inevitable investigation and suspension a week early.  Levenstein was suspended on May 11, 1995, but by May 17, Gill had Fann's formal letter of complaint in hand, and by May 21, had received two more letters by Moen and Kennedy containing serious allegations of sexual harassment.  Thus, even absent Salafsky's "shoot first, ask questions later" approach, Gill, consistent with her statements to Levenstein on both April 27 and May 8, 1995, would have been obliged to investigate the complaints.  *See Mathura v. Council for Human Servs. Home Care Servs.*, **1996 U.S.Dist. LEXIS 4127, at \*10 (S.D.N.Y. Apr. 2, 1996) ("[D]efendant's legitimate investigation into complaints against him of sexual harassment cannot support a constructive discharge claim.")**

Moreover, the Court finds that suspension pending the end of an investigation was warranted.  Because this is not a sexual harassment case, the Court will not evaluate all of the nuances of each complainant's allegations.  What is important is that the facially-credible

allegations against Levenstein – irrespective of whether they were true, or even if true, whether they constituted a violation of the University's sexual harassment policy – were sufficiently serious to warrant his suspension. This is particularly true given his substantial supervisory authority over the complainants as both a tenured faculty member and department head. The administrators' concerns understandably were amplified by Levenstein's attempts to discover the identity of the "anonymous" letter writer. Thus, even if Salafsky had an ulterior agenda in suspending Levenstein, the Court does not find that Salafsky was the cause, in fact, of the investigation *or* the suspension; rather, the series of complaints lodged against Levenstein were the cause. Put another way, Salafsky's acceleration of the *process* does not change the fact that the investigation and suspension were firmly grounded in a legitimate administrative *purpose*.

Second, the suspension, though lengthy, was not, by objective standards, an intolerable burden. A brief recap of the investigation's timeline is instructive. The complaints were filed, and Levenstein was suspended, in May 1995. Gill's investigation, which was undeniably extensive, concluded in July 1995. Gill submitted her detailed findings in August 1995. The AAP's recommendations to the University administrators were completed that same month. Levenstein opted to appeal the AAP's findings. The FAP's review of Levenstein's file (including the complaints and the AAP findings and recommendations), coupled with its own independent investigation, concluded in November, 1995. Salafsky, Moss and Broski reviewed the AAP and FAP findings, and finalized their recommendations in December. In January 1996, Stukel reviewed the Levenstein file accumulated to date (including the complaints, the AAP findings and recommendations, the FAP findings, and the administrators' recommendations), and determined that the process should continue. Stukel requested and received draft termination

charges from Broski on February 1. On February 7, Stukel, consistent with the University

Statutes, sought the advice of the FAC regarding Levenstein's dismissal. The FAC's delay in

deliberating was due, in part, to their consideration of Levenstein's academic misconduct charges

brought against Salafsky and other Rockford administrators. On April 15, the FAC found

Levenstein's academic misconduct charges to be meritless. The following day, on April 16, the

FAC advised Stukel that they opposed proceeding with termination proceedings. The University

Statutes required Stukel to decide whether to seek Levenstein's termination within thirty days of

receipt of the FAC's advice, by May 16. On April 23, Levenstein resigned. Had Stukel decided

to go forward with Levenstein's termination, further rounds of hearings and appeals were

available to Levenstein.

In *Loudermill*, the Supreme Court noted that "[a]t some point, a delay in the termination

process could become a constitutional violation." 470 U.S. at 547. Although *Loudermill*

addressed termination process delays in analyzing whether due process had been granted, and not

the present inquiry of whether a property right had been taken, the two inquiries are not

hermetically distinct. In *Loudermill*, the Court, in rejecting the petitioner's claim that he was

denied due process after a nine-month termination proceeding, reasoned as follows:

> [T]he complaint merely recites the course of proceedings
> and concludes that the denial of a "speedy" resolution
> violated due process. This reveals nothing about the
> delay except that it stemmed in part from the
> thoroughness of the procedures. . . . The chronology
> of the proceedings set out in the complaint, coupled
> with the assertion that nine months is too long to wait,
> does not state a claim of a constitutional deprivation.

470 U.S. at 547; *see also Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 524 (10th Cir.

1998) (tenure termination proceedings which lasted over three years did not violate due process).

Here, too, the Court finds that the administrative process, in which Levenstein was an active participant, was not unreasonably drawn out. The process was indeed lengthy. However, its length was not attributable to intentional foot-dragging, but rather to the multi-tiered nature of the review process, and, as in *Loudermill*, to the thoroughness with which each step was taken.

Third, and significantly, the suspension was temporary. Although the suspension may have, at times, felt endless to Levenstein, he was fully aware that his circumstances were not permanent. At any point on the procedural timeline between May 1995 and April 1996, Levenstein knew exactly which procedural step he was at, and further, which steps remained. Additionally, Levenstein's subjective belief that his suspension may not have ended favorably, though a reasonable notion, does not change the fact that his situation was, indeed, temporary. As Levenstein stated in his January 2 to Stukel, "Whichever way you go. . . ."

This reality dispositively distinguishes *Parrett*, the case on which Levenstein substantially relies. In *Parrett*, the plaintiff had been chief of detectives in Connersville, Indiana for many years, until he was reassigned indefinitely to "line captain." 737 F.2d at 693. However, he was informed that he would be assigned no duties in that capacity. He was relegated to a windowless room, formerly a storage closet, with only a desk and chair, and no telephone. *Id.* The plaintiff spent his shift sitting in the room literally doing nothing. *Id.* The Seventh Circuit found that the record revealed "no reason . . . why he was removed from his office as chief of detectives . . . other than [a supervisor's] animosity toward him stemming from a personal incident. . . ." *Id.*

Unlike the plaintiff in *Parrett*, whose reassignment was indefinite, Levenstein was in the

30

midst of an administrative process in which, until his resignation, he and his counsel had actively participated, *and* that, irrespective of Levenstein's distaste for the results, was moving along. *See also Townsend*, 256 F.3d at 678 (distinguishing *Parrett*, and declining to find constructive discharge because, *inter alia*, the plaintiff "was aware that he did not face the prospect of an indefinite or permanent reassignment to a job that provided little professional responsibility"). In addition, while the *Parrett* Court found "no reason" for the reassignment, here, the University had every reason to suspend Levenstein with pay pending exhaustion of the administrative process.

Finally, although consideration of the alleged bias of the University's investigative process fits more neatly under the due process inquiry, it also bears on the deprivation analysis, particularly in the constructive discharge context. Again, the Court is suspicious of Salafsky's motives in pushing for Levenstein's suspension and removal. Yet, his conduct does not irremediably taint the University's entire investigatory process. First, the allegations against Levenstein were numerous, credible and serious. Second, the evidence proffered contains no suggestion that it was the way the fact-finding was conducted, as opposed to Levenstein's own conduct, that generated the complaints. Third, Salafsky did not conduct the investigation, nor did he have the final word on the matter. *See Schacht v. Wisc. Dept. of Corrections*, 175 F.3d 497, 503 (7th Cir. 1999) (claims of bias fail where there was no evidence that the ultimate decisionmaker would have been biased); *McDaniels v. Flick*, 59 F.3d 446, 459-60 (3d Cir. 1995) (bias at earlier stages of the process is irrelevant so long as decisionmaker at a later stage is impartial). Finally, a global view of Levenstein's matter as it percolated through the process – from Gill's findings of sexual harassment in violation of University policy, to Adams'

31

recommendations including retention, to the FAP's measured advisory comments regarding corrective action, to the administrators' recommendations of termination, to the FAC's advice to Stukel rejecting termination – yields that any suggestion of bias might naturally yield a response of "against whom?"

Levenstein faced a tough choice between holding out to see where the process would lead or resigning. Indeed, the very fact that this *was* a tough choice augurs against a finding that Levenstein was compelled to do anything – a tough choice, yes, but still a choice. The Court thus declines to hold that Levenstein's exercise of his option to resign in the face of credible sexual harassment charges rather than face further proceedings constitutes a constructive discharge claim. *See Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000) (rejecting constructive discharge due process claim of state university professor accused of sexual harassment and given choice of resigning or facing potential disciplinary proceedings.) Because Levenstein was not constructively discharged, the university did not deprive him of a property right, and because Levenstein was not so deprived, he cannot sustain a due process claim.

## B.     Equal Protection

To prevail on a selective prosecution equal protection claim, a plaintiff must prove (i) that he was intentionally treated differently than other similarly situated persons, and (ii) that no rational basis existed for the different treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000). Also, there is Seventh Circuit precedent to the effect that for "class of one" equal protection claims, like Levenstein's, the "no rational basis" prong requires a heightened showing that the defendant "deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Hilton*

*v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000); *see also Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002). More recent Seventh Circuit authority suggests, however, that a "class of one" plaintiff still has the option of couching his claim in traditional equal protection terms. *See Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002) (a "class of one" equal protection plaintiff "must show that they were (1) intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment *or* (2) that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant."(emphasis added; internal quotations omitted) (*citing Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001)).

In this case, the Court need not decide whether Levenstein must meet *Hilton*'s "gloss[ed]" rational basis standard, because he fails to make the fundamental showing, under any equal protection standard, that he was treated differently than another similarly situated person. Levenstein attempts to side-step this requirement. In setting up his claim, Levenstein frames the law as follows: "To prevail on his 'class of one' equal protection claim, Levenstein must prove that the 'action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." (Pl. Post-Trial Br., p. 1.) (citation omitted). That's it. This, of course, only touches on what the Court does not reach here – whether Levenstein must prove, in addition to traditional equal protection requirements, that differential treatment was motivated by subjective ill will. *See Purze*, 286 F.3d at 455. Levenstein's omission is telling.

"To meet his burden that another employee is 'similarly situated,' a plaintiff must

demonstrate that there is someone who is directly comparable to him in all material respects." *Grayson v. O'Neill*, 308 F.3d 808, 817-18 (7th Cir. 2002) (citation omitted) "[I]n disciplinary cases – in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct. . . . This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (citations omitted).

Levenstein points to one employee whom he alleges was similarly situated, but treated differently. Specifically, a tenured professor (the "professor") who had allegedly touched a student's breasts "countless times," hugged her, kissed her and repeatedly told her to "turn around so he could see her butt," was not suspended or banned from campus. Levenstein's comparison is vulnerable on several fronts. First, unlike the complaints against Levenstein, the allegations against the professor were limited to one student, not three. Nor did the professor have a history of past informal complaints. Thus, any argument that the professor's conduct was *qualitatively* more serious is tempered by a *quantitative* comparison which cuts the other way. Second, the professor was not a supervisor – this is both factually and legally significant. As a factual matter, this means that, unlike Levenstein, the professor did not have supervisory control over the complaining student. More fundamentally, the University could be held strictly liable for sexual harassment by its supervisors such as Levenstein, but not for similar conduct by a non-supervising professor. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 759 (1998).

Further, the evidence demonstrates that the AAP did begin to investigate the allegations against the professor, but the complaining student indicated that she was resolving the matter with the professor and his department head, *i.e.*, she did not wish to pursue a formal complaint. A settlement agreement was reached, which included several preventive measures. The agreement was reviewed and accepted by AAP and University counsel. Thus, any differences between the University's treatment of Levenstein and the professor are easily reconciled by their materially different positions within the University and the dissimilar circumstances attendant to the sexual harassment allegations. Levenstein offers no other similarly situated individual. Accordingly, his equal protection claim must fail.

## III.    Conclusion

For the foregoing reasons, judgment is entered in favor of Defendants and against Levenstein. The Clerk is directed to enter a Fed.R.Civ.P. 58 Judgment terminating this case.


DATE:   September 5, 2003

Blanche M. Manning
United States District Judge